# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**BRIAN KEITH HAYNIE,**

   **Plaintiff,**

**vs.**                                                    **CIVIL ACTION NO. 3:19-CV-00478**

**ANDREW SAUL, COMMISSIONER OF**
**SOCIAL SECURITY,**

   **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By Order entered June 27, 2019 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Presently pending before the Court are Plaintiff's Brief in Support of Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 21, 22)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or alternatively, remand (ECF No. 21); **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 22); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

1

**Procedural History**

The Plaintiff, Bryan Keith Haynie, (hereinafter referred to as "Claimant"), protectively filed his applications for benefits on October 19, 2015, alleging disability since January 27, 2015[1], because of seizures, carpal tunnel, illiteracy, rupture/hernia, and back pain. (Tr. at 214-221, 239) His claims were initially denied on April 19, 2016 (Tr. at 120-129) and again upon reconsideration on August 17, 2016. (Tr. at 137-150) Thereafter, Claimant filed a written request for hearing on August 23, 2016. (Tr. at 151-155)

An administrative hearing was held on May 30, 2018 before the Honorable Maria Hodges, Administrative Law Judge ("ALJ"). (Tr. at 31-57) On July 30, 2018, the ALJ entered an unfavorable decision. (Tr. at 10-30) On July 30, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 212-213) The ALJ's decision became the final decision of the Commissioner on May 6, 2019 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On June 26, 2019, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 11, 12) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (ECF No. 21), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 22). Consequently, this matter is fully briefed and ready for resolution.

---

[1] Although Claimant testified that he could not remember why he alleged disability since January 2015 (Tr. at 36), in his application for benefits, he asserted that he was "fired for not doing my job. I then went to the unemployment office and rehab and my learning disability and physical condition was noted as a problem in getting further employment." (Tr. at 239)

## Claimant's Background

Claimant was 53 years old as of the alleged onset date, defined as a "person closely approaching advanced age", and he later changed age categories during the underlying proceedings, to that of a "person of advanced age." See 20 C.F.R. §§ 404.1563(d)-(e), 416.963(d)-(e). (Tr. at 23) Claimant has a high school education and attended special education classes, however, he alleges he is unable to read or write except for his name and address. (Tr. at 35) For ten years he worked for the City of Kenova, West Virginia as a garbage collector and as a helper for the Water Works; prior to working for the City of Kenova, he worked at the Gypsy Hammer Company unloading timber at a lumber mill. (Tr. at 37-38)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. §§ 404.1520, 416.920.  If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d).

If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart P of part 404 of this chapter for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity.  A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2).  Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3).  The

Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2019. (Tr. at 15, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since January 27, 2015, the alleged onset date. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: arthritis; seizure disorder; major depressive disorder; and somatic symptom disorder. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 17, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform medium work

> except [he] can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to temperature extremes, vibration, and pulmonary irritants; must avoid all exposure to hazards of moving machinery and unprotected heights; cannot perform commercial driving; can frequently handle and finger bilaterally;

6

can perform simple, routine, repetitive task; and can occasionally interact with others.

(Tr. at 18, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing his past relevant work. (Tr. at 22, Finding No. 6) In addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience and RFC, the then ALJ determined that there were other jobs that existed in significant numbers in the national economy that Claimant can perform. (Tr. at 23, Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from January 27, 2015 through the date of the decision. (Tr. at 24, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

In support of his appeal, Claimant asserts that the ALJ failed to fully develop the medical evidence of record with respect to both mental and physical impairments; that the ALJ also failed to properly evaluate Claimant's impairments in combination; and that these errors are compounded by the ALJ's disregard of Claimant's treating physicians' opinions that support Claimant's claim for disability by instead relying upon the opinions of non-treating non-examining physicians. (ECF No. 21 at 15-18) Claimant requests this Court reverse the final decision for an award of benefits or to remand to correct these errors. (Id. at 18)

In response, the Commissioner asserts that Claimant fails to demonstrate how the ALJ failed to develop the record, and further, the ALJ had the benefit of reviewing a complete record that included medical records dating as far back as 2003 from which she rendered a decision. (ECF No. 22 at 9-10) Regarding Claimant's argument that the ALJ failed to consider the combination of effects from his impairments, again, Claimant does not explain how the ALJ erred; nevertheless, the ALJ accounted for all Claimant's credibly established functional limitations from both his

severe and non-severe impairments in the RFC finding. (Id. at 10-11) Claimant merely lists the diagnoses and treatment he received, but fails to identify any functional deficits from same, which is not only insufficient to prove disability, but also his burden of proof. (Id. at 11-12) The ALJ explained how Claimant's impairments, singly and in combination, failed to meet Listing requirements at step three, which was further demonstrated in the ALJ's discussion of the evidence of record; significantly, no medical expert found Claimant's impairments met Listing requirements. (Id. at 12-14) Claimant fails to explain how any of his impairments, singly or in combination met Listing requirements and fails to show how the ALJ's step three finding negatively impacted his claim. (Id. at 14-15) Finally, the Commissioner states that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 16)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Wayne County School Records:

Claimant's school records from June 1967 to 1980 revealed low to average grades. (Tr. at 683) He graduated high school with a 1.88 grade point average, ranking 123rd out of 131 students. (Tr. at 684) The transcript indicates that Claimant received special education for science in the tenth grade. (Tr. at 17, 683)[3]

Browning Eye Care Records:

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

[3] Although Claimant and his mother testified that Claimant attended special education classes *in toto*, the ALJ found that the school records showed that Claimant received special education for only science. (Tr. at 17) The undersigned notes that the school records consist of only two pages (Tr. at 683-684), and that there is "(sp)" indicated next to the subject "science" for Claimant's tenth grade school year (Tr. at 683). However, the transcript contains no other indicia that Claimant attended special education classes.

Prior to the relevant period, on January 26, 2009, Claimant was diagnosed with cataracts in both eyes. (Tr. at 893)[4]

<u>Treatment for Chronic Back Pain:</u>

Claimant has a history of treatment for chronic back pain that pre-dates his alleged disability onset date by several years (Tr. at 695-697).[5]  In January 2014, Claimant presented to the emergency room after having suffered a fall at work with injuries to his neck, lower back and left hip; x-rays taken at the time revealed an unremarkable lumbar spine with no fractures, a normal cervical spine, a normal pelvis, a normal left hip, and a normal mid to distal left femur. (Tr. at 399-407) Subsequently, during the relevant period, in September 2016, diagnostic studies revealed no significant abnormalities; specifically, lumbar spine x-rays showed minor anterior wedge deformity at T12, likely chronic (Tr. at 818-819).  Hip x-rays also taken at the time were normal. (Tr. at 816-817).

An MRI taken on January 6, 2017 revealed a broad-based posterior disc protrusion at L4-5 level, no canal stenosis and mild bilateral neural foraminal compromise and at L5-S1, there was evidence of a small annular tear; the impression was mild degenerative changes with minimal posterior disc protrusions with no significant canal stenosis or neural foraminal compromise. (Tr. at 923) On January 19, 2017, Claimant presented to his primary care physician regarding his low back pain with stiffness associated with gait instability and to discuss the results of the MRI

---

[4] Counsel for Claimant indicates he "[c]onfirmed this with treatment with Jennifer of Dr. Browning". (ECF No. 21 at 11)
[5] On July 2011, Claimant was injured at work when he got hit in the right flank with a large drawer resulting in hematuria. (Tr. at 395) During a follow up visit on September 2, 2011, Claimant still experienced minimal right flank pain, but was voiding well and denied visible blood in urine, however hematuria was present microscopically. (<u>Id.</u>) It was noted Claimant had a mild enlarged prostate. (<u>Id.</u>) By May 9, 2012, Claimant reported no hematuria with normal voiding, although a dip stick urinalysis with microscopy was abnormal with large blood. (Tr. at 393) No lower back pain was noted and Claimant was assessed with right inguinal hernia, benign prostatic hypertrophy without urinary obstruction, and spermatocele on the right. (Tr. at 391, 393)

ordered by Dr. McComas. (Tr. at 809-813) It was noted that the MRI showed degenerative disc disease, and that Claimant tried multiple sessions of physical therapy, took Tylenol for pain, and that he was compliant with medication. (Tr. at 809) During numerous examinations with his primary care physician, it was observed that Claimant leaned forward while walking and occasionally exhibited decreased sensation in his legs, but otherwise he had normal joints, bones, and muscles, along with intact and symmetric deep tendon reflexes. (Tr. at 766, 774, 788-789, 802, 811, 822, 833, 888) Claimant took Tylenol or ibuprofen, and his physician routinely described his lower back pain as stable (Tr. at 763, 772, 786, 812). Claimant also participated in brief stints of physical and occupational therapy without success (Tr. 901-949).

Physical Therapy Records:

Claimant was initially evaluated to begin physical therapy for his chronic back pain on June 22, 2016. (Tr. at 942-944) It was noted that Claimant's back pain had worsened over time and that he presented with the physical appearance of being stooped. (Tr. at 939) Claimant's uncle accompanied Claimant to his appointment to help relay the information given Claimant's illiteracy; it was noted that the uncle helps take Claimant to his appointments although Claimant can and does drive at times. (Id.) Following a regimen of attending physical therapy sessions twice weekly, by July 13, 2016, the date of his discharge, it was noted that Claimant's range of motion did not change and that he did not benefit from physical therapy, although he required no assistive device for ambulation on even terrain or stair climbing. (Tr. at 930) The physical findings indicated that his back pain at rest was 2/10; with activity 9/10; described as sharp and localized; with exacerbating factors including bending and standing for 15 minutes or more; relieving factors included rest; and that he takes only Tylenol for pain. (Tr. at 929) Claimant's final level reached

following physical therapy indicated that he had moderate imitations in "specific IADL affecting performance" and that he was "unable to perform specific work activity secondary to pain or limitation." (Tr. at 930)

By May 25, 2017, Claimant reported to his primary care provider that he had been falling almost every day at least up to three times a day; he endorsed getting up to walk and then suddenly getting dizzy and black out and that his gait has worsened due to his frequent falls. (Tr. at 799) Physical therapy was ordered for this balance disorder. (Tr. at 803) A brain MRI was negative. (Tr. at 796-797) Claimant returned to physical therapy on June 14, 2017. (Tr. at 904-914) Claimant reported symptoms including dizziness, near syncope, frequent falls and unsteadiness with an onset date of Christmas 2016. (Tr. at 904) It was noted that Claimant used a quad cane to ambulate and that he reported having frequent falls and is unable to walk a block without falling. (Id.) He reported having in lumbar/thoracic spine area rated 5/10 on pain scale at worst, at best 0/10 and was currently 0/10. (Id.) It was observed that Claimant's trunk was significantly forward flexed placing his center of gravity forward of base of support and held his head in flexion further compromising his postural alignment and balance. (Id.) He exhibited a gait tolerance on level at least 250 feet and used handrails for stairs and was able to tolerate 2-4 steps at training stairs. (Tr. at 905) He was unable to complete balance testing due to significant ataxia. (Tr. at 905)

At his therapy session on June 16, 2017, Claimant reported back pain in his lumbar and thoracic areas and presented with the use of a rollator walker. (Tr. at 919) A June 20, 2017 therapy note indicated Claimant had impaired cognition and was having difficulty with performing novel tasks; requiring frequent cues during the session; his seated posture was very poor; and limited carry-over during the session regarding postural correction exercises. (Tr. at 918) On July 5, 2017,

Claimant reported a fall and that his back still felt uncomfortable. (Tr. at 903) It was noted that his abilities improved concerning his posture and his slouching over-correct, however, he still needed tactile cues, his ability to dissociate was much improved, he needed cues concerning his gait with the rolling walker, but did not retain cues regarding his posture. (Tr. at 903)

At follow up appointments with his primary care provider on July 20, 2017 and October 26, 2017, Claimant continued to endorse feeling lightheaded when he stands up and an unsteady gait; physical therapy and medication did not help. (Tr. at 786, 771) On January 4, 2018, Claimant returned for a follow-up visit and continued to report dizziness and lightheadedness when standing up, and that he had fallen three times in last one month, but no seizures during the last month. (Tr. at 763)

Marshall Health Records:

Since at least 2007, Claimant has had a history of upper gastrointestinal issues with chronic nausea and vomiting reported as well as abdominal pain, reflux and heartburn. (Tr. at 739-748) In August 2016, Claimant was seen for his long-standing history of constipation necessitating a colonoscopy. (Tr. at 736-738) On September 14, 2016, Claimant underwent a colonoscopy which resulted in a diagnosis of ascending colon near cecum mass, tubular adenomatous polyp which was negative for high-grade dysplasia or malignancy. (Tr. at 730) During a follow up appointment on September 22, 2016, Claimant reported no abdominal pain, normal bowel function and tolerating a regular diet. (Tr. at 724) Despite the pathologic diagnosis, Claimant's physician was greatly concerned for possible malignancy due to the gross appearance of the tubular adenoma, a repeat colonoscopy was recommended in one year. (Tr. at 728) On October 10, 2017, Claimant underwent a colonoscopy which revealed three polyps in the cecum; a repeat colonoscopy was

recommended in three years. (Tr. at 708-709) On October 10, 2017, an EGD revealed a moderate sized hiatus hernia in the stomach. (Tr. at 710)

Treatment for Breathing Issues:

A July 15, 2016 pulmonary function test showed Claimant had chronic airway obstruction. (Tr. at 828-829, 924-926) Because of Claimant's complaints of shortness of breath, a chest x-ray taken on September 29, 2016 revealed peripheral left upper lobe opacity with adjacent pleural thickening, thus, a follow-up CT scan was recommended. (Tr. at 814-815) On February 7, 2017 Claimant underwent a CT scan of his chest; the impression was a pleural based mass-like density in the left upper lobe, and the PET scan suggested malignancy was to be excluded. (Tr. at 789-790) On March 14, 2017, Claimant underwent PET diagnostic testing due to history of a pulmonary nodule. (Tr. at 790-791, 881-884) The upper left lobe was revealed to have an ill-defined density below the limits expected for malignancy, however, a repeat CT of the chest in six months was deemed necessary. (Tr. at 881) Claimant was assessed with severe COPD with emphysema. (Id.) Another CT scan in January 2018 indicated the lung mass was stable. (Tr. at 863) A follow up CT scan was recommended to confirm stability. (Id.) During a follow up appointment in April 2018, Claimant reported he had been very steady and denied any new changes in his cough, although he reported having off and on white yellowish sputum without change to the color or amount. (Tr. at 855) He denied chest pain, but did experience shortness of breath and wheezing. (Id.)

Treatment for Seizures:

Claimant had a history of seizures that began in 2008 (Tr. at 517-525, 615-646, 651-667, 669, 690). He treated with neurologist Carl McComas, M.D., every six months for medication

13

management (Claimant was prescribed the medication Dilantin). (Id.) In May 2014, Claimant was seen for problems with unusual epilepsy without intractable epilepsy; Dr. McComas assessed that most, if not all, of these events are hyperventilation attacks related to stress. (Tr. at 517) Claimant told Dr. McComas he had a major seizure on January 27, 2015, his alleged disability onset date, while he was sick with the flu (Tr. at 524); there are no records indicating that Claimant received emergency room treatment or hospital care for this event. Follow up records in June 2015 indicate that Dr. McComas assessed the January 2015 event as a "breakthrough seizure" and continued Claimant's schedule of Dilantin. (Tr. at 523) A brain MRI revealed no acute or pathologic process (Tr. at 791-792, 796-887).

On physical examinations, Dr. McComas consistently observed no significant neurological abnormalities (Tr. at 517-525, 615-646, 651-667, 669, 690). Claimant had equal and reactive pupils, intact extraocular movements, flat discs, good tone and strength throughout, and virtually absent reflexes. (Id.)

Bilateral Carpal and Cubital Tunnel Release Surgery:

On December 19, 2013, an EMG/Nerve Conduction Study revealed Claimant had moderate bilateral carpal tunnel syndrome and moderate bilateral ulnar neuropathies (Tr. at 534-535). In February 2014, Claimant underwent left carpal and cubital tunnel surgery on his wrist and elbow; he had the same operation to his right side in March 2014 (Tr. at 414-515, 528-556). Claimant received little treatment after the surgeries other than routine post-operative visits. (Id.)

Mental Health Treatment:

Claimant received no specialized mental health treatment during the relevant period and he did not take prescribed medication for mental health complaints. His examining providers

routinely recorded unremarkable mental status findings, including that Claimant was alert and oriented with a normal mood and affect (Tr. at 716, 719, 722, 726, 738, 766, 774, 789, 802, 811, 822, 833, 858, 867, 873, 880, 889).

Consultative Medical Examination:

Stephen Nutter, M.D., examined Claimant in February 2016. (Tr. at 669-675) Claimant reported that he was a two-pack-a-day-smoker for 41 years and identified back pain and seizures as his main complaints, stating he had constant pain in his mid-thoracic and lumbar spine that did not radiate and intermittent neck pain every other day that radiated down the left arm. (Tr. at 669) He explained that his back pain is aggravated by bending, stooping, sitting, lifting, standing, coughing and riding in car; his neck pain is aggravated by turning his head and rapid motions of the head and neck. (Id.) He reported problems with numbness and tingling in his left arm and left leg. (Id.) He stated that he had problems with seizures since 2008, with the most recent one occurring on February 10, and he gets no warning before the seizures. (Id.) Claimant reported that when he has a seizure, he loses consciousness, he falls down and has convulsions, and that he has experienced bladder incontinence. (Id.) He reported his seizures last for a few minutes and he has one every month or two. (Id.)

On examination, Dr. Nutter noted Claimant's visual acuity is 20/50 in the right eye and 20/70 in the left eye with glasses. (Tr. at 670) Dr. Nutter reported that Claimant appeared to have normal intellectual functioning, and he had intact recent and remote memory to describe his medical history. (Id.) Claimant walked with a slightly stooped but steady gait, did not use an assistive device, and could walk on his heels and toes but could not tandem gait or squat due to back pain. (Tr. at 670, 672) Dr. Nutter noted that Claimant exhibited diminished grip strength

when using the Odynometer for his age, but when squeezing his finger, Claimant was able to so well and with a good firm grip; Dr. Nutter rated his grip strength as being intact at 5/5 bilaterally. (Tr. at 671) He observed Claimant had normal joint range of motion in his hands and fingers, and could write and pick up coins with both hands without difficulty. (Id.)

Claimant had decreased range of motion in his neck and back due to pain, but normal straight leg testing; he was unable to balance adequately on the right leg and had a lot of difficulty trying to balance on the left leg, but exhibited full (5/5) muscle strength in his arms and legs, no muscle atrophy, slightly diminished sensation and reflexes in some areas, and intact cerebellar function. (Id.) Dr. Nutter noted that Claimant had no hip joint redness, warmth, swelling or crepitus, had tenderness in the left hip but not the right, with normal abduction and adduction of both hips. (Tr. at 672) Dr. Nutter summarized that Claimant's neurological examination showed no focal deficits or abnormalities other than sensory and reflex testing and that Claimant's strength testing was intact. (Tr. at 672) Lumbar spine x-rays ordered by Dr. Nutter were normal. (Tr. at 674)

Consultative Psychological Examination:

Psychologist Angela Null, M.S., examined Claimant in March 2016 and July 2016. (Tr. 676-681, 688-694) During the first evaluation in March 2016, Claimant stated that both medical and mental health issues are the primary reasons he is unable to work; pain was the primary focus of clinical attention during the interview. (Tr. at 677) He presented with some symptoms of depression and anxiety that Ms. Null believed to be associated with adjustment issues and recent stressors. (Id.) Claimant reported that he lived with his mother, walked for exercise, went to the grocery store, socialized with his mother and daughter, performed all activities of daily living

16

independently, prepared simple meals, cared for his dog, and watched television throughout the day. (Tr. at 680) He identified Dilantin, his seizure medication, as the only medication he was currently taking. (Tr. at 677)

Ms. Null administered intelligence tests, but determined the results were invalid due to Claimant's "extremely poor effort" (Tr. at 679). She opined that Claimant "appeared to be attempting to present himself as intellectually deficient" (Tr. at 680). Ms. Null further noted that the testing was invalid given that Claimant had maintained consistent employment for ten years despite his history of special education classes in high school. (Id.) During the mental status examination, Ms. Null noted that Claimant was cooperative and oriented with logical speech, presented with a generally appropriate affect, and connected thought processes, however, Claimant put forth very poor effort, affecting some of the mental status findings observed during the examination. (Tr. at 679)

During the July 2016 evaluation, Ms. Null again reported that Claimant's intellectual testing scores were inconsistent with his employment history, presentation, and ability to obtain a driver's license. (Tr. at 693)

State Agency Consultant Opinions:

None of the State agency medical consultants who reviewed the record opined that Claimant's impairments, either singly or in combination, met or were equal to any listed impairment (Tr. at 66, 99).

Psychological consultants Jeff Harlow, Ph.D., and James Binder, M.D., opined that Claimant's alleged mental conditions caused no functional difficulties and were not severe impairments (Tr. at 65-66, 97-98).

Physicians Rabah Boukhemis, M.D., and Curtis Withrow, M.D., opined that Claimant could perform medium work with postural and environmental restrictions (Tr. at 67-69, 100-02).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that he graduated high school, and that he attended special education classes, however, he cannot read or write except for his name and address. (Tr. at 35-36) He stated he had a driver's license, but his mother drives him from place to place. (Tr. at 36) He confirmed his alleged onset date to be January 27, 2015, but could not recall why that date was important other than it was when he applied for benefits. (Id.) Later, Claimant testified that he stopped working because he got fired for not doing his job. (Tr. at 42)

Claimant testified that he could not work because he can't walk and he uses a walker to walk because he passes out. (Tr. at 38) He stated he got the walker in 2017 from his doctor because of his passing out episodes[6], and testified that he passes out probably every other day. (Id.) He does not know why he passes out, only that he gets dizzy. (Id.) He stated that he does not receive any treatment for his passing out episodes, however, he also suffers from seizures for which he takes Dilantin. (Tr. at 39) He estimated that he has seizures three times a week, that they are brought on by stress, and last over an hour or longer. (Id.) He testified that Dilantin sometimes helps him not have seizures and he takes this medication regularly, however, he forgets to take his medication. (Tr. at 39-40)

---

[6] The ALJ noted in her decision that Claimant "reported being prescribed a walker by Ebenezer, but this is not documented in the records from that facility (Exhibit 16F). The records from Ebenezer advised to stand up slowly and avoid running or walking fast (Exhibit 16F/p.5)." (Tr. at 21-22, 767)

With regard to his back problems, Claimant testified that he has herniated discs and they hurt and described the pain as shooting to his right hip and down his leg, making it feel numb. (Tr. at 40) He indicated he can't walk or anything because of it. (Id.) When asked how far he can walk, Claimant estimated about five feet. (Id.) When asked how long he can stand before he needs to get off his feet, he estimated about ten minutes or so; he estimated he could sit in a chair for about an hour and a half. (Tr. at 41) He said his back pain causes him to wake up at night, but the pain doesn't increase "too bad" when his sitting. (Tr. at 45) Claimant stated that his pain is present more or less all the time; he lies down up to three times per day for over an hour or longer to relieve his pain. (Id.) He stated his pain affects his concentration. (Id.) Claimant also has upper back and neck pain that goes straight to the top of his head. (Tr. at 45-46)

Claimant testified that he could not lift a gallon of milk due to his carpal tunnel surgery and stiff arm; he stated the carpal tunnel surgery did not help with either hand. (Tr. at 41-42) He has pain in his hands that affects his grip and he drops things. (Tr. at 46)

Regarding his COPD, Claimant testified that he uses an inhaler twice a day; he stated that being hot makes breathing difficult, but not odors or fumes. (Tr. at 43) However, he does get shortness of breath in dusty environments and with physical exertion. (Id.) He also gets dizzy when he stands up. (Tr. at 44) When he has shortness of breath, he said he stops whatever he is doing and uses the inhaler. (Id.)

Claimant testified that he spent a normal day sitting on the couch watching TV. (Tr. at 42) His favorite show is Gunsmoke, but he is unable to follow the story. (Tr. at 43) He stated that he can dress himself, although he sits down to do so; he does not do any household chores or yard

work or shopping, and his mother "takes care of everything." (Tr. at 42) He stated that he moves at a "snail pace". (Tr. at 47)

    <u>Betty J. Haynie, Claimant's Mother's Testimony:</u>

    Mrs. Haynie confirmed that Claimant lived with her and that he has lived with her off and on his entire life. (<u>Id</u>.) She testified that Claimant is not able to "lift very much" or "pick up very much" since his carpal tunnel surgery. (Tr. at 48-49) She stated that Claimant complains about his low back pain and noted that he can't sit for very long and can't walk unless he holds onto the wall or walker. (Tr. at 49) Mrs. Haynie stated that Claimant does not remember things, "[i]t goes in one ear and out the other" and doesn't retain anything she tells him. (<u>Id</u>.) She testified that Claimant's memory, both long and short term, seems impaired. (Tr. at 49-50)

    Mrs. Haynie confirmed that Claimant was in special education classes from the time he started until the time he graduated. (Tr. at 49) She confirmed that Claimant cannot read or write other than his name and address and she has to read to him. (Tr. at 50)

    Mrs. Haynie has observed Claimant having a seizure, stating that he foams at the mouth and that he "goes out and he'll look at you grin and just goes." (<u>Id</u>.) She described another type of seizure Claimant has where "he'll just be sitting and he'll go like that and he's basically out of it." (<u>Id</u>.) She confirmed that Claimant has seizures two or three times a week. (<u>Id</u>.) She stated that when he's having a seizure, Claimant "goes out . . . and it will be a few minutes before he comes back to." (Tr. at 51)

    Mrs. Haynie testified that Claimant spends the majority of the day lying down; she stated that Claimant's medication makes him sleepy. (<u>Id</u>.) Mrs. Haynie testified that she does all household chores including yard work and taking out the garbage. (<u>Id</u>.)

Anthony Michael, Vocational Expert ("VE") Testimony:

The impartial VE testified during the hearing with no objection from Claimant's attorney. (Tr. at 52) The ALJ asked the VE to assume a person of Claimant's age, education, and work experience who could perform medium work, except he could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to temperature extremes, vibrations, and pulmonary irritants; must avoid all exposure to hazardous moving machinery and unprotected heights; could not perform commercial driving; could frequently handle and finger bilaterally; and would be limited to simple, routine, repetitive tasks involving occasional interaction with others. (Tr. at 53)

The VE testified that such a person could not perform any of Claimant's past relevant jobs, but could make a vocational adjustment to a significant number of medium, unskilled jobs existing in the national economy, such as the representative examples of night cleaner and laundry worker. (Tr. at 53-54) The VE further stated that if the individual were limited to occasional handling in the right, dominant hand, this limitation combined with the limitations to occasional interaction and simple work would eliminate both medium and light jobs. (Tr. at 54)

In response to questions from Claimant's attorney, the VE testified that if the individual was limited to lifting 5 to 6 pounds with either hand, all work would be precluded. (Tr. at 54-55) If both hands were limited to less than 10 pounds, then sedentary work would be eliminated. (Tr. at 55) If the individual had to lie down two or three times a day for at least half an hour to an hour, then all work would be eliminated. (Id.) If the individual had moderately impaired recent memory problems and severe concentration problems where he could not recall 30% of what he's been told

half an hour later and unable to concentrate and stay on task 75% of the time, then all work would be eliminated. (Tr. at 55-56)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles in all respects except for those limitations not covered therein such as the concentration and lying down and being off task limitations which were based on his education and work experience and resources from the Department of Labor and SkillTRAN publication. (Tr. at 56)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**Analysis**

As noted *supra*, Claimant has taken the position that in addition to the ALJ's failure to fully develop the evidence of record, which he contends establishes his claim for disability when considered in combination. Claimant also argues that the ALJ improperly evaluated the opinion evidence, giving more credit to the opinions of non-examining physicians who only reviewed portions of Claimant's file, thus, ostensibly, they rendered opinions without the benefit of review of the complete record.

The Duty to Develop the Evidence:

In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim in order to determine if it met the requirements in the listings of impairments amounted to a neglect of his duty to develop the evidence. Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he is disabled. 20 C.F.R. §§ 404.1512(a), 416.912(a) ("In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled." Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he has an impairment, further, the Regulations are

clear that this responsibility is ongoing at each level of the administrative review process.  Id. The

Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof
> in disability proceedings.  It is true . . . that the Secretary bears the burden of proof
> at step five . . . [b]ut the Secretary is required to bear this burden only if the
> sequential evaluation process proceeds to the fifth step.  The claimant first must
> bear the burden . . . of showing that . . . he has a medically severe impairment or
> combination of impairments . . . .  If the process ends at step two, the burden of
> proof never shifts to the Secretary.  . . .  It is not unreasonable to require the
> claimant, who is in a better position to provide information about his own medical
> condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, she is not required to

act as Claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-831 (8th Cir. 1994). In this case,

Claimant was represented by counsel and the ALJ has the right to assume that Claimant's counsel

was presenting the strongest case for benefits. See Laney v. Astrue, 2011 WL 11889, at *11

(S.D.W.Va. Jan. 4, 2011) (Eifert, M.J.) (citing Nichols v. Astrue, 2009 WL 2512417, at *4 (7th

Cir. 2009).  An ALJ's duty to develop the record does not require her to make specific inquiries

into Claimant's treatment modalities or search for cumulative evidence; her duty is obtain

sufficient evidence upon which she can render an informed decision. Id. (internal citations

omitted).

Claimant bears the burden of establishing a *prima facie* entitlement to benefits.  See Hall

v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not

be considered to be under a disability unless he furnishes such medical and other evidence of the

existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant

"bears the risk of non-persuasion."  Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

In this case, the ALJ expressly considered the medical evidence from February 2014 through January 2018[7] which included not only consultative examiner reports concerning Claimant's physical and mental impairments, but also treatment records from his primary care providers for his various ailments. (Tr. at 16-18, 20-22). In addition, the ALJ reviewed other evidence, which included Claimant's statements concerning his limitations from his physical and mental conditions, his school records, and the testimonies provided by Claimant himself and his mother. (Tr. at 16, 17, 19-20) The ALJ also considered the opinions provided by the State agency consultants. (Tr. at 22) Specifically, the ALJ noted and considered Claimant's testimony regarding his history of bilateral carpal tunnel syndrome, chronic obstructive pulmonary disease, illiteracy, constant back pain, complaints of numbness in both lower extremities, seizure disorder, as well as his hyperventilatory attacks with shortness of breath, black outs, and shakiness. (Tr. at 16-20) This also included the evidence concerning the treatment for these conditions, as well as the lack of medical treatment for depression since the alleged onset date (Tr. at 21), evidence showing what exacerbates his pain and other symptoms, and what he does for relief for same. (Tr. at 16-22) The ALJ also considered Claimant's mother's testimony concerning Claimant's complaints of back pain, his trouble picking up things due to his carpal tunnel syndrome, his need for a walker or to hold onto a wall when ambulating, his trouble remembering things, his attending special education

---

[7] Presumably, the ALJ considered the evidence that long preceded the January 25, 2015 alleged onset date in addition to the medical records developed just over a month prior to the administrative hearing on account of the numerous exhibits attached to the written decision. (Tr. at 25-30) "Absent evidence to the contrary, it must be presumed that the ALJ reviewed all of the materials in the record and presented by the [Claimant]." Turner v. Berryhill, 2017 WL 2805498, at *4 (N.D.W.Va. June 28, 2017) (citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite to specific evidence does not indicate that it was not considered."). "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision." Reid v. Commissioner of Social Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam).

and his illiteracy, her description of his seizures, that he lies down for the majority of the day, and the side effects Claimant appears to experience from his medication. (Tr. at 19-20)

Claimant does not specify what evidence the ALJ lacked in order to make an informed decision. Nevertheless, it is clear that the ALJ made numerous references throughout her decision concerning the evidence of record, which included Claimant's own statements concerning the frequency and limiting effects of his impairments. Indeed, as pointed out by the Commissioner, Claimant underwent three consultative examinations, one by Dr. Nutter and two by Ms. Null, in order to develop the record (ECF No. 22 at 9-10). In short, Claimant has failed to demonstrate any paucity in the evidence that would have necessitated the ALJ to further develop the record.

Accordingly, the undersigned **FINDS** that Claimant's contention that the ALJ erred by failing to develop the record is without merit.

The Combination of Impairments:

Although Claimant points out that the medical records indicated that he suffered from numerous impairments both mental and physical, he does not specify which impairment specifically meets or equals any Listing. The Regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

See 20 C.F.R. §§ 404.1523(c), 416.923(c). When confronted with a combination of impairments, an adjudicator must not only acknowledge "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has

held that the ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. Id. In short, the ALJ must analyze the cumulative or synergistic effect that the various impairments have on Claimant's ability to work. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

"The Listing of Impairments . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." See 20 C.F.R. §§ 404.1525(a), 416.923(a); Sullivan v. Zebley, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that his combination of impairments is "equivalent" to a listed impairment, and he "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See Id. at 531.  A claimant must meet all, not just some, of the criteria for a listing to apply. Id. at 530.

It is important to note that at the second step in the sequential evaluation process, the ALJ found that Claimant's carpal tunnel syndrome was not a severe impairment, noting that despite Claimant's testimony that the release surgeries did not help with his ability to grasp things, that he drops things and that he still had numbness and tingling, the record shows that Claimant had no further treatment for this condition since his surgeries in February 2014 and March 2014 (Tr. at 16, 478-516). Moreover, the ALJ noted that Dr. Nutter observed during his examination that Tinel's testing was negative, that Claimant was capable of making fists with both hands, that despite Claimant's diminished grip strength with the Odynometer, he was 5/5 during the physical exam and that he could write and pick up coins with either hand without difficulty (Tr. at 16, 669-

675). Also, the ALJ found Claimant's COPD to be a non-severe impairment because it is controlled with the use of inhalers; despite Claimant's ongoing complaints and the factors that aggravate this condition, pulmonary function studies indicated only "minimal airway obstruction" (Tr. at 16, 829), a CT scan of his lungs indicated COPD with emphysema (Tr. at 16, 889) and an examination in April 2018 showed no increased work of breathing or signs of respiratory distress and evidence of decreased breath sounds (Tr. at 16, 858). Finally, despite Claimant's allegations that he was illiterate except that he could write his name and address, the ALJ noted that the psychological examiner determined that the testing results suggesting Claimant's extremely low range of intellectual functioning and full scale IQ of 46 was invalid due to Claimant's failure to put forth his best effort and that he "tried to present himself unfavorably intellectually." (Tr. at 16, 676-682) Indeed, the ALJ noted that during the second psychological examination, it was noted that Claimant's testing scores were deemed to be "a minimal estimate of the claimant's true potential" and significantly, "Ms. Null explained that she did not diagnose the claimant with borderline intellectual functioning because the intellectual testing scores appeared to be much lower than what would be expected given his history of consistent employment for 10 years, his presentation, and ability to obtain a driver's license." (Tr. at 16-17, 676-682, 688-694) In short, the ALJ found Claimant's alleged illiteracy not a medically determinable impairment because "[t]he evidence shows the claimant is not illiterate" despite the fact his school records showed he did not do well and that "he received special instruction for only science." (Tr. at 17, 683-685)

Next, at the third step of the sequential evaluation process, the ALJ herein evaluated Claimant's impairments under Section 1.00 which pertains to the musculoskeletal system. (Tr. at 17) She noted that none of the examining or treating physicians' reports showed that Claimant had

ambulatory deficits as described in Section 1.00(B)(2)(b) as required under Section 1.02(A) and

referenced Exhibits 6F, 8F, 9F, 15F, and 16F. (Tr. at 17, 517-526, 651-668, 669-675, 700-762,

763-844)[8] Based on this medical evidence, the ALJ also determined that there was no indication

that Claimant had neurological deficits as required under Section 1.04(A). (Id.) Therefore, the ALJ

determined Claimant did not have an impairment or combination thereof equal in severity to any

listed impairment, "as no treating or examining physician mentioned findings equivalent in

severity to the criteria of any listed impairment." (Tr. at 23)

Under Section 1.00(B)(2), "[t]o ambulate effectively, individuals must be capable of

sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of

daily living. They must have the ability to travel without companion assistance to and from a place

of employment or school." Under Section 1.04(A), there must be

> Evidence of nerve root compression characterized by neuro-anatomic distribution
> of pain, limitation of motion of the spine, motor loss (atrophy with associated
> muscle weakness or muscle weakness) accompanied by sensory or reflex loss and,
> if there is involvement of the lower back, positive straight-leg raising test (sitting
> and supine).

As demonstrated by the medical evidence of record, *supra*, there is no evidence of this which

would support Claimant's argument that his physical impairments alone would have met Listing

requirements. Later in the written decision, the ALJ acknowledged that Claimant has a history of

back pain, radiculopathy including numbness in both lower extremities and that diagnostic studies

resulted in diagnoses including lumbosacral radiculopathy and degenerative joint disease. (Tr. at

20, 763-844) The ALJ also noted that Claimant received physical therapy for these conditions and

---

[8] This included the office treatment records from Dr. McComas dated May 23, 2014 to June 5, 2015, and from
December 19, 2013 to December 14, 2015; the Consultative Examination Report provided by Dr. Nutter dated
February 16, 2016; the medical records from Marshall Health dated March 13, 2007 through October 25, 2017; and
the progress notes from Ebenezer Medical Outreach, Marshall Health, dated June 9, 2016 through January 4, 2018.

that his back and leg pain was treated with ibuprofen. (Tr. at 20, 901-949, 763-844) Significantly, the ALJ found that despite Claimant's complaints of numbness in his lower extremities and his physician's examination findings that he ambulated with forward leaning, had normal joints, bones and muscles, had reflexes 2+ and symmetric and decreased sensation in both lower extremities, an x-ray taken in January 2018 showed no acute findings and Claimant's physician continued to treat him with ibuprofen, found his back impairment stable, and did not refer him to a specialist for his degenerative disc disease. (Tr. at 20, 763-844)

Further, the ALJ noted the findings of the consultative examiner, Dr. Nutter, who observed earlier in February 2016 that despite Claimant's "slightly stooped and painful gait", he did not require a handheld assistive device and that an examination of his legs showed no tenderness, swelling, or crepitus, and though he had pain, tenderness and decreased range of motion in the cervical, lumbar, and thoracic spines, straight leg testing was normal. (Tr. at 20-21, 669-675) Claimant's inability to balance adequately on the right and left legs and to perform tandem gait or squat due to pain notwithstanding, he demonstrated normal muscle strength bilaterally in both upper and lower extremities and an ability to walk on the heels and toes. (Tr. at 21, 669-675) The ALJ acknowledged Dr. Nutter's diagnoses included chronic cervical and dorsolumbar strain and seizures. (Tr. at 21)

With regard to Claimant's history of seizure disorder, the ALJ noted Claimant experienced a major seizure on January 27, 2015 and had "hyperventilatory attacks with shortness of breath, black outs, and shakiness" but an MRI of his brain revealed no acute or pathological process. (Tr. at 20, 517-526, 651-668) The ALJ observed that Claimant's treating neurologist, Dr. McComas, indicated Claimant's hyperventilation attacks were likely related to stress and that he had

"consistently noted no neurological deficits related to the claimant's seizures. The overall evidence shows the claimant's seizure disorder has been adequately managed with medication. He has experienced only a few hyperventilation episodes." (Tr. at 20, 651-668, 763-844) Importantly, the ALJ noted that Claimant denied having any seizures at a January 2018 appointment and that at the same appointment, Dr. McComas noted that Claimant's seizures "were controlled with medication", and the record contained no other treatment notes since then. (Tr. at 20, 763-844)

With respect to Claimant's mental impairments, and although the ALJ determined Claimant's diagnosis of major depressive disorder and somatic symptom disorder were severe at the second step (Tr. at 16, 676-682, 688-694), at the third step, the ALJ determined these impairments singly or in combination did not meet or medically equal the criteria of Listings 12.04 and 12.07. (Tr. at 17) In understanding, remembering, or applying information, the ALJ determined Claimant had a moderate limitation based on Claimant's reports in having trouble remembering, understanding and following instructions, that he can only write his name and address, that he obtained his driver's license, that he could not pay bills or use a checkbook but could count change and handle a savings account and based on the psychological examiner's report that his recent memory was mildly deficient, remote memory was mildly deficient and his immediate memory was moderately deficient. (Tr. at 17, 298-307, 676-682) In interacting with others, the ALJ found that Claimant also had moderate limitations based on his reports that he did not socialize with others, that he attended doctor's appointments, did not go out to eat or attend movies, and that he exhibited mildly deficient social functioning during consultative examinations. (Tr. at 17-18, 298-307, 676-682, 688-694) In concentrating, persisting, or maintaining pace, the ALJ found that Claimant had a mild limitation based on his reports of having trouble concentrating

31

due to back pain and that he exhibited severely deficient concentration, varied persistence, and moderately slow pace during the consultative examination, although the consultative psychologist deemed Claimant's testing results invalid because he failed to put forth his best effort. (Tr. at 18, 676-682, 688-694) Finally, with regard to adapting and managing oneself, the ALJ found that Claimant had a mild limitation based on his report that he attended to his personal care, and although he denied performing any household chores or yard work during his hearing testimony, he told the psychological examiner in March 2016 that he prepares simple meals, does the laundry and does yard work; the ALJ further noted that Claimant subsequently told the psychological examiner in July 2016 that he was unable to cook or do laundry. (Id.)

Having determined that Claimant's mental impairments did not result in any "marked" or "extreme" limitations, the ALJ found that no "paragraph B" or "paragraph C" criteria had been met. (Tr. at 18) Indeed, the ALJ noted later in the decision that "[t]here is no evidence of the claimant receiving treatment for depression since January 27, 2015" and that he had not been prescribed medication for this impairment and further, his "treating physician has consistently noted findings of full orientation with a normal mood and affect." (Tr. at 21, 763-844)

Next, the ALJ considered Ms. Null's March 2016 psychological examination report, specifically noting that she diagnosed Claimant with somatic symptom disorder with persistent pain and adjudgment disorder, as she observed that "chronic pain was a focus of clinical attention during the interview", but he did not put forth his best effort during testing. (Tr. at 21, 676-682) The ALJ also considered Ms. Null's July 2016 examination, wherein she affirmed her prior diagnoses. (Tr. at 21, 688-694)

Clearly, the ALJ considered the evidence of record with respect to Claimant's physical and mental impairments and correctly determined that despite the myriad of medical conditions Claimant had experienced since he alleged he became disabled, there is no indication in the record that supports his contention that his impairments met any Listing criteria, either singly or in combination. As noted by the ALJ, the record contains no opinion by any physician, treating or examining, that confirms Claimant's physical impairments met any Listings. (Tr. at 17)

Accordingly, the undersigned **FINDS** that Claimant's argument that his impairments, singly or combined, met Listing requirements lacks merit, the undersigned further **FINDS** that the ALJ's step three determination is supported by the substantial evidence.

<u>The Evaluation of Opinion Evidence:</u>

The Regulations provide the definition for "medical opinions":

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). The Regulations further provide that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." <u>Id</u>. §§ 404.1527(b), 416.927(b). "Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion." <u>Id</u>. §§ 404.1527(c), 416.927(c). The Regulations govern how an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6) including: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5)

Specialization, and (6) various other factors. Medical opinions as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational factors" are determinations reserved solely to the Commissioner. Id. §§ 404.1527(d)(2), 416.927(d)(2). To that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. §§ 404.1527(d)(3), 416.927(d)(3).

Claimant has explicitly stated that the ALJ "summarily ignored" the "opinions" of his treating physicians, and references several exhibits: Exhibits 3F, 6F, 9F, 11F, 15F, 16F, 17F, 18F, 19F, and 20F. (ECF No. 21 at 16)[9] It is significant that with the exception of Dr. Nutter's evaluation findings, discussed further *infra*, none of these records contain a medical opinion as defined by the Regulations.[10] To the extent that Claimant's physical therapist had determined that he was "unable to perform specific work activity secondary to pain or limitation" (Tr. at 930) which Claimant has argued corroborates a disability finding, it is well known that the Regulations specifically reserve disability and work-related determinations solely to the Commissioner, and any opinions with respect to same do not enjoy any special significance. 20 C.F.R. §§ 404.1527(d), 416.927(d).

Moreover, as pointed out by the Commissioner (ECF No. 22 at 11-12), Claimant merely lists numerous diagnoses rendered by various providers, and fails to denote any corresponding

---

[9] These exhibits concern: Claimant's bilateral carpal and cubital tunnel releases; seizure treatment notes; Dr. Nutter's consultative examination report; Claimant's school records; treatment records from Marshall Health concerning his colonoscopy; treatment for tubular adenoma mass and EGD; treatment records for back pain, seizures, shortness of breath, joint pain and other ailments; treatment records for a hernia that predated the alleged onset date, from 2011-2012; treatment for COPD and lung mass; records concerning eye examinations that predate Claimant's alleged onset date, from 2003-2009; and physical therapy records, respectively.

[10] In his closing argument, Claimant also asserts that the ALJ "substituted her opinions for those of the claimant's treating physicians" (ECF No. 21 at 19) but fails to identify any opinion by any of Claimant's treating providers, and fails to provide any further explanation or argument in support of this blanket statement. Nevertheless, as stated *supra*, the record contains no treating physician opinion; it appears that Claimant simply conflates diagnoses and treatment notes with opinion evidence. Accordingly, Claimant's argument to this extent lacks merit.

functional limitations (ECF No. 21 at 16-17). As noted *supra*, these records do not contain any statements concerning functional limitations or what Claimant "can still do despite [his] impairment" that would lend themselves to a proper evaluation of opinion evidence as entertained by 20 C.F.R. §§ 404.1527, 416.927. Further, diagnoses alone do not establish disability, because there must be a showing of related functional loss. See <u>Gross v. Heckler</u>, 785 F.2d 1163, 1166 (4th Cir. 1986) (*per curiam*) (internal citations omitted). Nevertheless, as discussed *supra*, the ALJ did consider these records in rendering her decision.

With regard to the opinion evidence, contrary to Claimant's argument, the ALJ explicitly considered Dr. Nutter's opinion several times in her written decision (Tr. at 16, 20-21, 22). The ALJ gave "significant weight" to Dr. Nutter's opinion because "it is consistent with the evidence of record", but also, the ALJ correctly observed that Dr. Nutter "did not provide functional limitations" in his report. (Tr. at 22, 669-675) The ALJ also explicitly considered Ms. Null's opinion numerous times in the written decision. (Tr. at 16-17, 18, 21, 22) Ultimately, the ALJ gave Ms. Null's opinion "some weight", and correctly noted that she also provided no functional limitations in her reports. (Tr. at 22)

With respect to Claimant's argument that the ALJ erred by giving more credit to the non-examining State agency physicians' opinions because they "reviewed a part and not all of [Claimant's] medical records" (ECF No. 21 at 18), Claimant neither identifies which exhibit, record or other evidence that the State agency medical and/or psychological consultants should have considered and whether any record or other evidence would have altered their opinions, nor does Claimant provide any further explanation for why he contends their opinions are deficient. The undersigned notes that the ALJ observed that at the initial level of review, Dr. Boukhemis

opined that Claimant could perform medium work except he can occasionally climb ramps and stairs and crawl; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, and crouch; should avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, and poor ventilation; and should avoid even moderate exposure to hazards. (Tr. at 22, 58-71, 72-85) The ALJ also noted Dr. Withrow's opinion at the reconsideration level of review which corroborated all of Dr. Boukhemis's findings, except he determined that Claimant can only occasionally balance. (Tr. at 22, 90-104, 105-119) The ALJ also noted that neither State agency psychological consultant found Claimant's mental impairments were severe, and that the ALJ afforded their opinions only "little weight" given the evidence of record, which included the diagnoses provided by the consultative psychological examiner, Ms. Null.

It is undisputed that the physical RFC assessment provided by Dr. Boukhemis was based on the record of evidence through February 2016, which included Dr. Nutter's examination report, Ms. Null's first examination report, as well as numerous records from Claimant's primary care providers and his treating neurologist, Dr. McComas. (Tr. at 59-62, 73-76) This evidence also included Claimant's own Functional Report and Pain Questionnaire. (Tr. at 61, 75-76) Similarly, at the reconsideration level of review, Dr. Withrow reviewed all these records, but also Ms. Null's second consultative psychological examination report and any additional records obtained through August 2016. (Tr. at 91-96, 106-111) Regardless, the evidence received by both State agency physicians was insufficient to justify any significant change to their opinions rendered at either level of review.[11]

---

[11] It is noteworthy that the ALJ's RFC assessment nearly mirrors those provided by the State agency medical consultants, although the ALJ provided additional restrictions concerning Claimant's handling and fingering on account of his bilateral carpal tunnel syndrome as well as limitations to performing simple, routine, repetitive tasks and only occasional interactions with others to accommodate Claimant's mental impairments. (Tr. at 18) The

However, of greater importance here is that the ALJ had the opportunity to review all of the evidence of record prior to rendering her decision. The ALJ specifically noted that in addition to not having received any treatment for depression since his alleged onset date (Tr. at 21) with regard to Claimant's mental impairments, the objective findings from diagnostic studies indicated that Claimant's physical impairments, particularly with regard to his back issues, showed only mild findings and were managed with ibuprofen without any referrals to a specialist. (Id.) It is also significant that the ALJ expressly observed that in the most recent treatment notes from January 2018, Claimant's primary care providers advised him "to stand up slowly and avoid running or walking fast." (Tr. at 22, 767) The ALJ has discharged her duty pursuant to Sections 404.1527(c) and 416.927(c) and provided an adequate explanation allowing for meaningful review. See, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

In short, Claimant's contention that the opinions provided by the State agency consultants were based only on "a part and not all" of the evidence of record and therefore the ALJ was erroneous to rely upon same is without merit. Accordingly, the undersigned **FINDS** the ALJ's evaluation of the opinion evidence is supported by substantial evidence.

Finally, the undersigned further **FINDS** that in light of the ALJ's analysis of the evidence of record, the final decision denying Claimant's applications for benefits is supported by the substantial evidence.

---

undersigned further notes that Claimant mentions briefly in his concluding argument that the ALJ's decision should be remanded so that "a more accurate hypothetical question" can be posed to the vocational expert in light of Claimant's physical and mental limitations (ECF No. 21 at 19), however, Claimant neither identifies any specific limitation that the ALJ ignored in her RFC analysis, nor provides any explanation as to how the hypothetical question posed by the ALJ is deficient. Accordingly, given the lack of any argument supporting this position, Claimant has waived any argument on this specific issue. Grayson O Company v. Agadir International LLC, 856 F.3d 307, 316 (4th Cir. 2017).

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 21), **GRANT** the Defendant's request to affirm the decision below (ECF No. 22), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of

such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: February 25, 2020.



Omar J. Aboulhosn
United States Magistrate Judge